UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ARTHUR and MARGARET SPIEGEL,

                    Plaintiffs,

          -against-                              No. 06-cv-203 (WKS/DRH)

ADIRONDACK PARK AGENCY;
MARK SENGENBERGER, in his official
capacity as Acting Executive Director
of the Adirondack Park Agency;
RICHARD LEFEBVRE, in his official
capacity as Executive Director of
the Adirondack Park Agency; and
PAUL VAN COTT, in his official capacity
as Enforcement Officer for the
Adirondack Park Agency,

                    Defendants.

_____


**OPINION and ORDER**

     Plaintiffs Arthur and Margaret Spiegel allege that the

Adirondack Park Agency ("Agency"), its executive director, acting

executive director and enforcement officer have engaged in

selective enforcement with regard to Agency Permit No. 87-28,

which imposes restrictions and conditions on lots in the Fawn

Ridge subdivision in the town of North Elba ("Town"), near Lake

Placid, New York.  In a Final Enforcement Order of September 7,

2005, the Agency determined that the Spiegels' partially-

constructed home on Lot 39 of the subdivision violated three

provisions of the Permit: a restriction on height, a requirement

that homes located on ridge line lots be set back at least twenty

feet from an abrupt change in slope, and restrictions on removal of successional tree growth.  Before the Court are the parties' cross-motions for summary judgment.  For the reasons that follow, the Spiegels' motion (Doc. 88) is **denied**, and the Agency's motion (Doc. 85) is **granted.**

### Factual Background

The following facts are undisputed, except where noted.  In the mid-1980s Lakewood Properties, Inc. ("Lakewood") commenced a project to develop 54 residential lots on 264.4 acres of land on the edge of the village of Lake Placid, New York.  The area previously contained ski trails and temporary housing for the 1980 Olympics.  The subdivision is known as "Fawn Ridge."  Fawn Ridge is located within 1000 feet of an intensely developed commercial strip on New York State Route 86 to the north, and 500 feet west of Lake Placid and its densely populated center area. The residential lots are in an area of the Adirondack Park Land Use and Development Plan designated "moderate intensity use." Land uses in the vicinity of the project include residences and commercial uses.  On April 22, 1988 the Agency issued Permit No. 87-28 to Lakewood, granting conditional approval to the project.

The Permit includes findings that slopes on the project site vary from zero to 65%, with nearly half the lots containing slopes from 15 to 25%, but all lots having sites with slopes of less than 15%, suitable for a homesite and driveway.  Several

lots would be readily visible from adjoining residential and commercial establishments, given that portions of the treed slopes of the hillside had been partially cut for a long time. Lots 39 and 40 were principally or entirely open field at the time, and dwellings on other lots might also be visible if their height were to exceed the tree canopy.  The findings stated that conditions were necessary to ensure that visual impacts of the project would be minimized.  Finding 17 noted "[t]opography, restriction of building height to a maximum of 30 ft., use of warm earth colors on structures, control of clearance of vegetation, retention of front, side and backyard vegetation, and eventual higher growth of existing trees will aid in screening the visibility of the project."  (Permit No. 87-28 at 11, Privitera Aff. Ex. Z (Doc. 88-49).)

The Permit contains 21 conditions.  It states that failure to comply with either the findings of fact or conditions voids the permit.  (Condition 2, Permit at 13.)  It states that Lakewood must notify all prospective lot purchasers of the permit conditions, and provide the permit to the supervising engineer and contractors and ensure compliance with the permit conditions. (Condition 5, Permit at 14.)  Before construction Lakewood must provide the Agency with documentation and get written confirmation of a deed restriction of a thirty foot building height limitation, measured from the highest point of the

structure (excluding fireplace chimney) and the lowest point of either existing or finished grade adjacent to the structure. (Condition 7(a), Permit at 15.)  Development on individual residential lots must comply with the following: not more than 5,000 square feet of existing tree vegetation cleared; no more than half of all trees four inches or more at breast height cut for a distance of fifty feet downslope from each structure; no clearings for views greater than twenty feet wide; no more than half of all trees six inches or more in diameter cut on any lot; no structure higher than thirty feet; no dwellings constructed on existing slopes greater than 25% measured over fifty feet horizontal distance; successional tree growth allowed to occur; dwellings for ridge line lots 39-41 and 50-54 located at least twenty feet back from the abrupt change in slope at the top of the hill.  (Condition 15(b)-(d), (g)-(j), Permit at 18-19.)  The permit does not define further the "abrupt change in slope."

The Permit conditions are binding on Lakewood and its successors.  The Nettie Marie Jones Trust ("Trust") succeeded Lakewood as the project sponsor.  Both Lakewood and the Trust however conveyed deeds to lots in Fawn Ridge that did not contain the thirty foot building height restriction that the Permit required.  The Agency has not taken action against Lakewood or the Trust for violating the conditions of the Permit.

Lakewood created the Fawn Ridge Architectural Review

4

Committee ("Committee") to review lot plans and designs for the subdivision.  The Spiegels' deed for Lot 39 states that no building shall be constructed unless complete and adequate plans are approved by the Committee.  There is no evidence that the Agency delegated authority to the Committee to enforce Permit compliance, however.

To facilitate the Committee's review of lot development, project leader Ivan Zdrahal created Lot Development Control Notes as a guide for landowners.  The Control Notes remind lot owners that they are required to obtain Committee approval for their site and building plans prior to construction.  The Control Notes also advise prospective purchasers that "[l]ot development shall comply with the established deed restrictions, approved plans and conditions in the Adirondack Park Agency Permit."  (Lot Development Control Notes at 2, Privitera Aff. Ex. EE (Doc. 88-54).)  Arthur Spiegel served on the Committee from approximately 2001 to 2004.

In 1992 the Spiegels acquired Lot 38 in Fawn Ridge and built a house.  The deed to the lot contained a thirty foot building height restriction.[1]  In 1994 the Spiegels acquired Lot 39, a premier lot in the subdivision.  The deed to Lot 39 contained a thirty-five foot height limitation rather than the thirty foot

---

[1]  The Spiegels have also owned or had interests in Lots 35 and 23.

restriction required by the Agency Permit.  Lot 39 was historically a ski slope, a wide open field of grass, small brush and blueberry bushes.  In the late 1980's, about the time the Permit issued, Lot 39 contained open views of Lake Placid and Whiteface Mountain.  The Permit expressly recognized the open character of the lot.

In 1999 the Spiegels hired a construction company to grade and seed a 50 by 100 square foot area of the lot, about thirty feet from the road.  At that time the area was an overgrown field, with brush and scattered small trees, one to four inches in diameter.  Some small trees were removed.

In 2002 the Spiegels began the process of seeking approval from the Committee for a house on Lot 39.  The Spiegels obtained approval for their design plans from the Committee in June 2004. The Town also approved the plans.

Sometime before construction began, Arthur Spiegel showed the plans to Eugene Byrne, his neighbor across the street, whose view would be impeded by construction on Lot 39.  The Byrnes complained to the Agency that the design plans for the house on Lot 39 appeared to violate applicable land use regulations.  The parties dispute when the Byrnes' initial complaint was made and whether the Agency took any action on their initial complaint, but agree that on September 24, 2004 Mrs. Byrne called the Agency, and an Agency staff member filled out a potential

6

violation report and opened a file.  The parties dispute whether
Mrs. Byrne spoke directly with the Agency enforcement officer,
Defendant Van Cott, at that time, or whether he personally opened
the file.

The Agency had adopted general enforcement guidelines
("Guidelines") in January 2003.  The Guidelines were not intended
to be binding or to create any substantive or procedural rights.
(Guidelines § VI, Privitera Aff. Ex. QQ (Doc. 88-66).)  The
Guidelines state the Agency objectives as, among other things,
obtaining compliance with regulatory environmental requirements,
and deterring additional violations by consistently requiring
that properties in violation be brought into compliance.
(Guidelines § III.)  To that end, Agency enforcement efforts are

> calculated to encourage prompt, voluntary cooperation
> resulting in the firm, but fair resolution of
> violations.  It is the Agency's intention to generally
> provide an incentive to violators who voluntarily and
> promptly agree to a binding obligation to achieve
> resolution of the violation, both with respect to
> remediation and the payment of any civil penalties.

(Guidelines § III.)

The Guidelines set forth enforcement procedures for
complaints about possible violations.  (Guidelines § V.)  Once a
complaint is received, an Agency enforcement officer
investigates, with the assistance of a staff attorney.
Investigations receive priority based on "the potential for
significant environmental damage and the need for prompt action."

7

(Guidelines § V at 4.)   Staff are encouraged to resolve
violations at the administrative level.   (Guidelines § V at 5.)
A violation that cannot be resolved at the staff level is
referred to the enforcement committee.   The enforcement committee
makes a determination whether a violation has occurred and the
appropriate disposition of the matter.   (Guidelines § V at 5-6.)
Where violations cannot be resolved at the administrative level,
the Agency may request the Attorney General to initiate a civil
action.   (Guidelines § V at 6.)

The Agency also had drafted guidelines for prioritizing
reported violations, although these guidelines were not adopted.
The enforcement officer for a reported potential violation
assigns a status ranging from Priority 1 to Priority 4, based on
factors such as ongoing significant environmental damage, high
profile cases, cases where delay may cause significant legal or
economic difficulties, and the length of time a case has been
open.

Van Cott has testified that he believed, based on his review
of the complaint, that the violation was a minor violation of the
height restriction, and that he drafted and sent a letter to
Arthur Spiegel informing him of the potential Permit violation,
with a copy to the Town's Code Enforcement officer.   Arthur
Spiegel avers that he did not receive the letter.   The Town Code
Enforcement officer has no record or recollection of having

received a copy of the letter.  Van Cott then closed the file.

Mrs. Byrne called the Agency several more times.  In early 2005, the Byrnes hired counsel to assist them in inducing the Agency to act on their complaint.  On February 3, 2005, after hearing from the Byrnes' counsel, Van Cott reopened the file and assigned an enforcement investigator.  When Van Cott reopened the Spiegel case, he designated it Priority 2, as a case "where continued delay may create significant legal problems or economic hardship for the landowner."  (Draft Enforcement Priority Guidelines, Privitera Aff. Ex. RR (Doc. 88-67).)

On February 4, 2005 the Byrnes' counsel followed up his phone call with a letter stating the Byrnes' belief that there may be violations of the Permit's height, slope and setback restrictions, and that fill may have been used to raise the height of the lot.  Van Cott spoke with Arthur Spiegel about the potential violations of the Permit, and asked him to stop construction[2] pending the Agency's investigation.  Spiegel agreed.

Van Cott and the Spiegels had neither met nor spoken to each other before the February telephone call.  The Spiegels believe, however, that Van Cott, as an active member of the Democratic Party in Essex County, New York, must have heard of Arthur

---

[2]  Between September 2004 and February 2005 the Spiegels had poured a foundation, commenced framing, and had incurred substantial construction costs.

Spiegel, a public figure in the Lake Placid area with ties to the Republican party.  Arthur Spiegel feels that he has been singled out for violation of the Permit, and suspects that Van Cott is motivated by political animus.

The Agency conducted several site inspections, and determined that the house was well over thirty feet in height. An Agency engineer calculated the height of the house at 43.7 feet, and added eight feet to the measurement to account for fill.[3]  By the Spiegels' own calculations the house stands 44.5 feet high.  The Agency engineer also determined that the house was not set back twenty feet or more from the abrupt change in slope.  APA staff also concluded that the Spiegels had removed successional tree growth, and that the Spiegels' house was the most visible of any dwelling in Fawn Ridge from Route 86 or Lake Placid.

On March 22, 2005 the owner of Lot 54 also complained about ongoing construction on the Spiegel house in apparent violation of the height restriction.  On March 30, 2005 the Agency issued a Cease and Desist Order prohibiting the Spiegels from continuing construction.  The Agency states this is because the Spiegels had proceeded to construct a porch in violation of their agreement to halt construction except for providing necessary protection from

---

[3]  The parties dispute whether the house was built on fill or original grade.

10

the elements.

On April 15, 2005, the Agency commenced an enforcement proceeding by issuing a Notice of Intent to suspend the Permit with respect to Lot 39.  In the meantime, attorneys for the Agency and the Spiegels were discussing but unable to agree on a settlement.  The Spiegel matter was the first enforcement proceeding since the adoption of the Guidelines in January 2003. The Agency had not previously issued a Notice of Intent in the form issued to the Spiegels.

The Spiegel Notice of Intent alleged that the Spiegels violated the Permit by failing to locate their house at least twenty feet back from the abrupt change in slope, failing to allow successional tree growth to occur, and building a house that exceeds the thirty foot height limitation.  The Notice acknowledges that there may be other previously built homes in the Fawn Ridge subdivision that exceed the thirty foot height restriction.  Prior to the 2004 complaint from the Byrnes, the Agency had received no complaints about noncompliance with the Permit in the Fawn Ridge subdivision.[4]  The Agency does not conduct routine permit compliance monitoring; the Spiegels do not dispute that the Agency typically learns of potential violations

---

[4]  The Agency investigated a potential height restriction violation on Lot 9 of Fawn Ridge in 1990.  No enforcement action was taken because it appeared at the time that the structure was in compliance.

through complaints by adjoining landowners or reports filed by local code enforcement officers.

The Notice provided an opportunity for the Spiegels to respond in writing and to request a hearing before the enforcement committee.  The Spiegels made several settlement submissions; none were acceptable.  The Agency remained concerned about the house's visibility; although Lot 39 is a former ski slope and the Permit's findings acknowledge the likelihood that a dwelling on Lot 39 would be readily visible, the Permit's conditions reflect the intention that Fawn Ridge lot owners in general and ridge line lot owners in particular utilize several techniques to aid in screening visibility.  Those techniques included setbacks from the abrupt change in slope, successional tree growth, limits to tree cutting, and subdued colors on the structures.

The Agency gave notice and solicited comments from other Fawn Ridge property owners concerning the Notice of Intent.  The Agency had not previously solicited public comment concerning a Permit violation.  The parties dispute whether this procedure was acceptable to the Spiegels' former counsel, and whether this was a violation of Agency rules.

In response to the Notice of Intent, the Spiegels submitted a written request to modify the terms of the Permit as to their property, and waived an adjudicatory hearing.  In support of

their request the Spiegels argued 1) their deed contained a building height restriction of thirty-five, not thirty feet as required by the Permit, and Lakewood never provided a copy of the Permit; 2) they had complied with all building and zoning requirements for the Town, had received the appropriate permits and passed several inspections; 3) they were never notified by the Town, the Fawn Ridge Architectural Review Committee, their contractors or the Agency that their building plans violated the Permit; 4) the Agency delayed notifying the Spiegels of the alleged violations until months after it received the complaint and the Spiegels began construction; 5) no vegetation had been removed from the lot that would have qualified as successional growth; 6) the facade of the building would blend into its surroundings once the exterior was finished and screening vegetation planted; and 7) the Spiegels' house was not the only dwelling out of compliance with the Permit.

On July 13, 2005 the Agency issued a non-final enforcement order dated July 8, 2005 determining that the partially constructed residence was not in compliance with conditions 15(g) limiting structure height to thirty feet; 15(i) requiring successional tree growth to occur; and 15(j) requiring a twenty foot setback from the steep slope.  It suspended the Permit with respect to Lot 39, and invited the Spiegels to submit measures to bring the structure into compliance.

The Spiegels' further attempts to settle were unsuccessful, and on September 7, 2005 the Agency issued a Final Enforcement Order, which it transmitted via facsimile and first-class mail to the Spiegels' attorney.  The Final Enforcement Order found the Spiegels in violation of Permit Conditions 15(g), (i), and (j), found that these conditions were designed to reduce the visual impact of new construction, declined to modify the Permit conditions and suspended the Permit with respect to Lot 39.

Also in September 2005, the Agency opened files on other ridge line lots to determine their compliance with the height restriction and other conditions of the Permit.

The Spiegels did not appeal the order.  The Agency referred the matter to the Office of the Attorney General on December 7, 2005.  The parties dispute whether the Agency or the State sought a substantial monetary penalty in addition to bringing the structure into compliance, and whether the Agency failed to negotiate in good faith.  On February 15, 2006 the Spiegels brought this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 against the Agency, its former and acting executive director and its enforcement officer, for selective enforcement, violations of substantive and procedural due process and related claims under the New York State Constitution.  Their amended complaint also seeks a judgment that the Defendants are estopped from enforcing the Permit against

14

them.

The New York Attorney General filed suit in New York State Supreme Court, Essex County, against the Spiegels on April 19, 2006 on behalf of the Agency and the State of New York.  The action has been stayed by stipulation pending the outcome of this litigation.

The Court dismissed the due process claims by order dated May 20, 2006.  Currently before the Court are the parties' cross-motions for summary judgment on the selective enforcement claim.

## Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A 'genuine issue' exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001).  Speculation and conjecture, however, will not defeat the motion.  *Id.* at 499. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  In resolving cross-motions for summary judgment, the evidence must be construed in the light most favorable to the non-moving party for each motion.  *See Fund for Animals v. Kempthorne*, 538 F.3d 124, 131 (2d Cir. 2008).

### Discussion

The Equal Protection Clause of the United States Constitution[5] bars a state official or agency from selective adverse treatment of an individual, when compared with others similarly situated, "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980); *accord Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005).  To prevail on a claim of selective enforcement in this Circuit, plaintiffs must show both that they were treated differently from other similarly situated individuals, and that such differential treatment was based on either an "impermissible consideration" or malicious or bad faith intent to injure. *Harlen Assocs.*, 273 F.3d at 499.

_____

[5]  The Spiegels' equal protection claim under the state constitution is coextensive with their federal claim.  *See Hernandez v. Robles*, 855 N.E.2d 1, 9 (N.Y. 2006) (New York's "Equal Protection Clause 'is no broader in coverage than the Federal provision.'") (citing *Under 21, Catholic Home Bureau for Dependent Children v. City of New York*, 482 N.E.2d 1, 8 n.6 (1985)); N.Y. Const. art. I, § 11.

Alternatively, plaintiffs can make out a "class-of-one" equal protection violation where they establish "that they were intentionally treated differently from other similarly-situated individuals without any rational basis." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). "Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside*, 468 F.3d at 159. Plaintiffs

> must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Id.* Because determining whether parties are similarly situated is a fact-intensive inquiry, summary judgment on this ground is warranted only "where no reasonable jury could find that the persons to whom the plaintiff[s] compare[] [themselves] are similarly situated." *Id.*

## I.   The Spiegels' Motion for Summary Judgment

The Spiegels do not allege that they are members of a constitutionally protected class, or that they are being punished for the exercise of a constitutional right.  They contend that the Agency acted with malice or bad faith sufficient to satisfy

the *LeClair* standard, and that they were intentionally singled out for adverse treatment without any rational basis sufficient to satisfy an *Olech* class-of-one claim.  For the Spiegels to be entitled to summary judgment this Court must be able to conclude as a matter of law that the Agency intentionally treated them differently from other similarly situated individuals with no rational basis or out of malice.

### A.   Others Similarly Situated

The Spiegels assert that they are similarly situated to all other landowners in the 54-lot Fawn Ridge subdivision, all of whom are subject to the Permit.  The Agency argues[6] that only the Fawn Ridge ridge line lots can be similarly situated.  The parties agree that only the eight ridge line lots--Lots 40, 41 and 50 through 54, in addition to the Spiegels' Lot 39--are subject to Condition 15(j), requiring that houses be set back at least twenty feet from the abrupt change in slope at the top of the hill.  The Agency could only have investigated or found a

---

[6]  The Agency also argues that no other Fawn Ridge landowners are similarly situated to the Spiegels, because only the Spiegels were found to have violated three conditions of the Permit, only the Spiegels refused reasonable settlement offers and waived their right to a hearing, and only the Spiegels asked the Agency to modify the Permit.  With this argument essentially the Agency asks the Court to conclude that the Spiegels cannot count themselves similarly situated to any other Fawn Ridge landowner because the Agency has not pursued any other Fawn Ridge Permit violations.  Neither the Spiegels' interactions with the Agency nor the Agency's treatment of the Spiegels is particularly relevant to the issue of whether the landowners are similarly situated.

violation of Condition 15(j) for the seven[7] homes built on ridge line lots, and not for any of the rest of the thirty-six homes in the subdivision.  Because the Spiegels were charged with violating a Permit condition shared by only eight of the fifty-four lots, no reasonable jury could find that all Fawn Ridge landowners are similarly situated to the Spiegels.

Although a reasonable jury *could* find that the ridge line lot owners are similarly situated, the Spiegels have not shown that a reasonable jury *must* find that they are similarly situated.  In other words, although the Spiegels can survive the Agency's motion for summary judgment on this issue, they have not demonstrated that they are entitled to summary judgment on the same point.

Viewing the evidence in the light most favorable to the Agency, a reasonable jury could credit the following as creating critical distinctions between the Spiegels and other ridge line homeowners.  The Agency does not actively monitor Permit compliance, but largely relies on complaints to trigger investigations of violations.  Prior to the Spiegel investigation, the Agency had received no complaints about any ridge line homes with possible Permit violations.  Other than the Spiegels' allegations that other ridge line houses also violate the height restriction, there have been no subsequent complaints.

---

[7]  The eighth ridge line lot, Lot 40, is vacant land.

In the Agency's view the Spiegel house egregiously violated three Permit conditions and was by far the most visible ridge line house.

Because a reasonable jury could conclude from these facts that the Spiegels were not similarly situated to the other ridge line homeowners, the Spiegels' motion for summary judgment must be denied.

## II. The Agency's Motion for Summary Judgment

If the Spiegels cannot point to evidence sufficient to establish the existence of each of the essential elements of their case, the Agency will be entitled to summary judgment. *See Celotex*, 477 U.S. at 322. As discussed above, the Spiegels could convince a reasonable jury that they are similarly situated to other ridge line homeowners. Only if they also demonstrate that they can convince a reasonable jury that the Agency 1) intentionally treated them differently 2) out of malice or 3) with no rational basis may they defeat the Agency's motion.

### A. Intentionally Different Treatment

The parties agree that the Agency had not been notified of any potential Permit violations by Fawn Ridge ridge line home owners until it began investigating the Byrnes' complaint against the Spiegels. The parties also agree that after the Agency commenced an investigation into the Spiegel violations, the Spiegels brought other Permit violations to the Agency's

20

attention.  Although the Agency opened investigative files on each of the alleged violations, no other Fawn Ridge homeowner has received a cease and desist order, and no other enforcement proceedings have been brought.  The parties dispute whether the Agency has undertaken any meaningful investigation of the other alleged Permit violations, and whether and to what degree other ridge line houses do not comply with the Permit.

Knowledge of other violations is generally a prerequisite for intentionally different treatment.  *See LaTrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 69-70 (2d Cir. 1999).  A mere failure to pursue other violations is not a basis for a selective prosecution claim.  *See id.* at 70 (quoting *LeClair*, 627 F.2d at 608).  Nevertheless, evidence that the Agency consciously chose not to investigate or pursue Permit violations by similarly situated homeowners, essentially declining to take official action against the other Permit violators, could establish that the Spiegels were treated selectively.  A reasonable jury could conclude that the Spiegels had received intentionally different treatment.

**B.   Malicious Intent**

The Spiegels have alleged that Van Cott, an active Democrat, was "out to get" Arthur Spiegel because he is a well-known active Republican.  They have no direct evidence of political animus.  Arthur Spiegel speculated, based on an editorial that appeared in

21

a local paper congratulating Van Cott on his work for local

Democratic candidates,[8] that Van Cott's motivation for

instituting the enforcement action was political.  As evidence of

this politically motivated malice the Spiegels claim that the

Agency intentionally failed to follow its enforcement guidelines,

seeks to enforce a void permit, and destroyed evidence.

The evidence of political ill will is speculative at best.

Arthur Spiegel stated his feeling in a deposition as follows:

> It seemed very strange to me that every newspaper
> article would quote Mr. Van Cott and then would refer
> to me as a Republican who was appointed to several
> boards by the Governor, et cetera. . . . But I gotta
> tell you when I read that an attorney that's in a case
> against me is personally congratulated in a big article
> in the newspaper for promoting and being the sole
> reason of a Democratic sweep in the politics of Saranac
> Lake, I have to believe he has something in his agenda
> other than patting me on the back. . . .[W]hat did I do
> wrong simply because I have an allegiance to a party
> that was very good to me . . .?  So I have allegiance
> to them.  He has allegiance.  It's just very obvious to
> me there's something wrong with what's going on here.

(Spiegel Dep. Tr. 81:16-82:16 (Doc. 85-36).)  Arthur Spiegel was

unaware of the political affiliation of the other individual

Defendants, and of the Agency commissioners.  Van Cott and the

Spiegels did not know each other before the Byrnes complained to

the Agency.

The Spiegels claim that the Agency intentionally deviated

---

[8]  Although Arthur Spiegel testified that he had read such
an article, he wasn't sure of the date.  Neither party has
produced the article.

from its enforcement guidelines by 1) not immediately assigning an enforcement officer to investigate; 2) belatedly assigning a Priority 2 ranking to the Spiegels' case; 3) devoting insufficient effort to settlement before commencing administrative action; and 4) providing public notice of the Agency's intent to suspend the Permit with opportunity for public comment.  These actions, they contend, ensured that they would incur substantial costs and tended to inflame local sentiment against them.  These contentions, if proven in their entirety with all reasonable inferences drawn in the Spiegels' favor, do not constitute evidence of malice or bad faith, however.[9]

The asserted failure to follow enforcement guidelines does not establish that the Agency or any of the individual defendants acted out of malice, politically motivated or otherwise.  "The branch of equal protection law that protects individuals from unequal treatment motivated by 'malicious or bad faith intent to injure' provides protection from adverse governmental action that is not motivated by 'legitimate governmental objectives.'" *Bizzarro*, 394 F.3d at 87 (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995).  This standard must be "scrupulously met," *LeClair*, 627 F.2d at 611; a reasonable jury must be able to conclude that the Agency's action "was a spiteful effort to 'get'

---

[9]  That the Agency was slow to investigate the Byrnes' complaint could as easily be evidence of absence of malice as malice.

him for reasons wholly unrelated to any legitimate state objective." *Esmail*, 53 F.3d at 180.  None of these actions, singly or taken as a whole, can reasonably be found wholly unrelated to the legitimate objective of enforcing the conditions of the Permit.

The Spiegels claim however that the Permit is void, and that persisting in enforcing a void permit against them is additional evidence of malice or bad faith.  This issue did not arise in the agency enforcement proceeding, where the Spiegels actively sought to modify the terms of the Permit they now claim is void.  The Spiegels' Amended Complaint makes no assertion that the Permit is void.  This new theory, whatever its merits, is not evidence that the Agency or the individual Defendants acted with malice when they brought an enforcement proceeding based on violations of the conditions of a Permit that all parties assumed to be valid.

Finally, the Spiegels argue that two Agency e-mails provided during discovery that bear the subject line "Fawn Ridge" are blank.  The documents are dated May 12, 2006 and September 1, 2006, well after this lawsuit commenced.  The metadata contained in the electronic files indicates that they were "modified" some months after they were generated.  The Spiegels claim that this is a case of spoliation and that they are entitled to an adverse inference, specifically an adverse inference of malice.

The Agency's Information Technology Specialist has attested

24

that the "emails" were appointments, and that the "modification" occurred when he exported the data to turn over to the Office of the Attorney General.  The content of an email cannot be modified once sent or received.  One communication was a forwarded message that did not include the original attachment, but the original attachment was produced to the Plaintiffs.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  Sanctions for spoliation

> should be designed to (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."

*Id.* (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).  "The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'"  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *Kronisch*, 150 F.3d at 126).

The elements of a claim of spoliation include a duty to preserve records, a culpable state of mind, and a showing that the destroyed records were relevant to the party's claim or defense.  *Byrnie*, 243 F.3d at 109.  The Spiegels have not made

25

out the elements of the claim.  Although it is undisputed that
the Agency was obligated to preserve such evidence, there is no
persuasive evidence that the electronic documents were destroyed
or significantly altered, much less that this was done with a
culpable state of mind.  Most importantly, the Spiegels must
produce some evidence suggesting that the allegedly missing
information was relevant to proof of malice, not merely relevant
to their lawsuit.  *See id.* at 108.  In this case they can only
speculate that the documents related to their lawsuit, rather
than to other open Fawn Ridge investigative files, for example.
The fact that the documents were created some two years after Van
Cott is supposed to have initiated his strategy to "get" the
Spiegels further attenuates any link to proof of malice.

Even were the elements of spoliation satisfied, the sanction
of permitting the Spiegels to survive summary judgment on the
element of malice in their selective prosecution claim would be
inappropriate.  Although in a close case an adverse inference can
defeat summary judgment, this is not a close case.  The evidence
of malice is insubstantial at best.  *See id.* at 107 ("In
borderline cases, an inference of spoliation, in combination with
'some (not insubstantial) evidence' for the plaintiff's cause of
action, can allow the plaintiff to survive summary judgment.")
(quoting *Kronisch*, 150 F.3d at 128).  The alleged destruction or
alteration of these two communications, absent a showing of

relevance to the issue of bad faith or malice, does not warrant
an adverse inference of malice.

Because the Spiegels' contentions of political ill-will,
failure to adhere to internal guidelines, enforcement of a void
permit, and destruction of evidence, taken in the light most
favorable to them, do not demonstrate malice directly or warrant
an inference of malice, the Agency is entitled to summary
judgment on their *LeClair* claim.  *See Bizzarro*, 394 F.3d at 87-
88.

###    C.    **No Rational Basis**

The Spiegels have also alleged that the Agency acted
irrationally by insisting that their house not be visible from
Lake Placid; by seeking destruction of their house along with a
substantial penalty rather than settling; by failing to determine
the visual impact of a Permit-compliant house on their lot; by
failing to pursue the developer and other Fawn Ridge lot owners
for Permit violations; by failing to acknowledge that the Permit
was void; by finding that the Spiegels had removed successional
tree growth from the lot; and by finding them in violation of the
setback requirement of Condition 15(j) when they had complied
with the slope requirement of Condition 15(h).  Thus they argue
that they survive summary judgment on a "class of one" equal
protection claim of intentionally different treatment from others
similarly situated with no rational basis for the difference in

treatment.  *See Olech*, 528 U.S. at 564.

The Agency argues first that an *Olech* class of one analysis
does not apply to the Agency's treatment of the Spiegels, citing
the recent United States Supreme Court decision in *Engquist v.
Oregon Department of Agriculture*, 128 S. Ct. 2146 (2008).  In
*Engquist*, the Supreme Court held that "the class of one theory of
equal protection does not apply in the public employment
context."  *Id.* at 2151.  It reasoned that "some forms of state
action . . . by their nature involve discretionary decisionmaking
based on a vast array of subjective, individualized assessments,"
*id.* at 2154, and it suggested in dictum that a class of one
challenge may be inappropriate whenever government action results
from the exercise of discretionary authority.  *Id.* at 2154-55.
It distinguished *Olech*, a challenge to a village's demand for an
easement to connect to the water supply that was more than twice
as long as that required of other property owners, as involving a
clear standard against which departures could be assessed.
"There was no indication in *Olech* that the zoning board was
exercising discretionary authority based on subjective,
individualized determinations--at least not with regard to
easement length, however typical such determinations may be as a
general zoning matter."  *Id.* at 2153.

The Agency, focusing on its discretionary authority to
administer an enforcement scheme, rather than the presumed clear

28

regulatory standards of that scheme, asks the Court to extend the rationale of *Enquist* to bar the Spiegels' class of one claim. Such an extension is unnecessary for the disposition of this case, because a reasonable jury could not conclude that the Agency lacked a rational basis for its treatment of the Spiegels.

What is not at issue in this lawsuit is the wisdom, or the legal correctness, of the Agency's conclusions in its Final Order.  The Agency determined that the Spiegels violated Permit Conditions 15(g), (i) and (j), and that these conditions were designed to reduce the visual impact of new construction from certain vantage points.  The Spiegels have not appealed the Agency's findings, and in fact there is no real dispute that the structure is more than thirty feet tall, is located within twenty feet of the abrupt change in slope, and that successional tree growth was removed.[10]  Even were the Agency's conclusions error however, they were based on facts obtained from the Agency's investigation.  "*Olech* does not empower federal courts to review

---

[10]   Although the Spiegels protest that the Agency's standard of height measurement changed, and that it incorrectly measured their house, they cannot deny that by any standard, including their own, the structure is more than thirty feet tall.  Nor do they claim that they were unaware of the Permit height restriction.  Although the Spiegels assert that Lot 39 was an open ski slope and that they did not cut down trees, they have not disputed that they interfered with successional tree growth. Although the Spiegels point out that their house is built on a slope that complies with Condition 15(h) prohibiting construction on slopes greater than 25%, they have not disputed that their house is perched on, not set back from the abrupt change in slope as required by Condition 15(j).

government actions for correctness.  Rather an *Olech*-type equal
protection claim focuses on whether the official[] conduct was
rationally related to the accomplishment of the work of [the]
agency." *Bizzarro*, 394 F.3d at 88-89.

The Agency was established to regulate development in the
Adirondack Park region, and its "powers and goals thus resemble
those of both a local planning board and a local zoning entity."
*Hunt Bros., Inc. v. Glennon*, 613 N.E.2d 549, 550-51 (N.Y. 1993).
Pursuant to those powers the Agency undertook an investigation,
initiated an enforcement proceeding, determined that the Spiegels
had violated the conditions of their permit and decided to
suspend their permit until they brought their structure into
compliance.  Because this conduct was rationally related to the
work of the Agency to regulate development in the Adirondack Park
region, it did not lack a rational basis.  *See Bizzarro*, 394 F.3d
at 88.

Although the Spiegels argue that their house would have less
of a visual impact than a Permit-compliant house, they do not
dispute that the Agency is empowered to take visual impacts into
consideration.  Thus the Agency's consideration of visual impacts
likewise did not lack a rational basis, even if the Spiegels
believe that the Agency made an erroneous determination, based on
inadequate information.

The remaining instances cited by the Spiegels likewise fail

to demonstrate a lack of rational basis for the Agency's conduct. The newly-raised allegation that the Permit is void provides no more support for an *Olech* claim than it does for a *LeClair* claim, given that all parties relied at the time on the Permit's validity.  Moreover, Section 581-3.1 of title 9 of New York Codes, Rules and Regulations grants the Agency authority to modify, suspend or revoke an agency permit for noncompliance, and Section 581-3.2 sets forth the procedure for undertaking the action.  N.Y. Comp. Codes R. & Regs. tit. 9, §§ 581-3.1, 581-3.2 (2009).  The terms and conditions of a permit remain in effect until the Agency makes a final determination.  *Id.* § 581-3.4. The Spiegels have offered no authority for the proposition that, absent any Agency action, the Permit language "[f]ailure to comply with either [the findings of fact or the conditions] voids the permit" automatically voided the Permit upon any permittee's failure to comply with any condition.

The Spiegels' contention that the Agency acted irrationally because it has not brought an enforcement action against Lakewood, the Trust or other Fawn Ridge homeowners does not support an equal protection claim.  *LeClair*, 627 F.2d at 608 ("Mere failure to prosecute other offenders is not a basis for a finding of denial of equal protection.").  The allegation that the Agency delegated its authority to enforce the Permit conditions to the Fawn Ridge Architectural Review Committee is

not supported by the record.

The Spiegels have failed to raise a triable issue of fact on their class of one equal protection claim, and the Agency is entitled to summary judgment.

### Conclusion

For the reasons stated above, summary judgment is granted to the Agency on the Spiegels' equal protection claims under the United States Constitution and the Constitution of the State of New York.  The Spiegels' federal and state due process claims were previously dismissed.  The Court declines to exercise supplemental jurisdiction over the remaining claim of estoppel, pursuant to 28 U.S.C. § 1667(c)(3).


Dated at Burlington, Vermont, this 16th day of September, 2009.


                              /s/ William K. Sessions III[11]
                              William K. Sessions III
                              United States District Court

_____

[11]Sitting by designation in the Northern District of New York.